**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:18-cr-149-SI |
| | Case No. 3:18-cr-594-SI |
| v. | |
| | **OPINION AND ORDER** |
| **JULIE ANN DeMILLE**, | |
| Defendant. | |

**Michael H. Simon, District Judge.**

On April 16, 2020, Defendant Julie Ann DeMille ("Ms. DeMille") filed an Emergency

Motion for Compassionate Release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF 75.[1] The

Government objected, arguing that Ms. DeMille had not yet exhausted her administrative

remedies. The Court agreed and denied Ms. DeMille's motion without prejudice and with leave

to renew. On April 29, 2020, Ms. DeMille timely filed a Motion to Reconsider Emergency

Motion for Compassionate Release. ECF 80. The Government opposes Ms. DeMille's renewed

---

[1] Ms. DeMille filed motions for compassionate release in both Case No. 3:18-cr-149-SI and Case No. 3:18-cr-594-SI. Although this Opinion and Order applies to both cases, all citations to electronic case file docket numbers ("ECF") refer only to the first case, Case No. 3:18-cr-149-SI, unless otherwise expressly stated.

motion on the merits. For the reasons that follow, the Court DENIES Ms. DeMille's motion for reconsideration.

## LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE

### A.  Modifying a Term of Imprisonment for Compassionate Release

A district court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 824-25 (2010). Congress, however, has expressly authorized a district court to modify a defendant's sentence in three limited circumstances: (1) when granting a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A); (2) when expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; or (3) when a defendant has been sentenced based on a sentencing range that has subsequently been lowered by the Sentencing Commission. 18 U.S.C. § 3582(c)(1). The motion before the Court seeks compassionate release.

Before 2018, § 3582(c)(1)(A) required that a motion for compassionate release could be brought only by the Bureau of Prisons ("BOP"). The First Step Act ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), amended § 3582 to authorize courts to grant a motion for compassionate release filed by a defendant. A defendant, however, may only bring a motion for compassionate release *after*: (1) petitioning the BOP to make such a motion on the defendant's behalf; *and* (2) either (a) the defendant has exhausted all administrative appeals after the BOP denied the defendant's petition or (b) thirty days has elapsed after the warden of the defendant's facility received the defendant's petition, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A).

Compassionate release under § 3582(c)(1)(A) authorizes a court to modify a defendant's term of imprisonment if the court finds that two conditions have been satisfied. The first is that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). The second is that "such a reduction is consistent with applicable policy statements issued by the

Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The court also must *consider* the factors

set forth in 18 U.S.C. § 3553(a), to the extent they are applicable. *Id.*

## B.  Extraordinary and Compelling Reasons

The Sentencing Commission policy statement for reducing a term of imprisonment under

§ 3582(c)(1)(A) is found in the United States Sentencing Guidelines Manual ("USSG") at

§ 1B1.13. That policy statement explains the phrase "extraordinary and compelling reasons."

USSG § 1B1.13(1)(A) and cmt. 1. According to the policy statement, extraordinary and

compelling reasons are: (1) the medical condition of the defendant (defined as whether the

defendant is suffering from a terminal illness; or is suffering from a serious physical or medical

condition, serious functional or cognitive impairment, or deteriorating physical or mental health

because of the aging process, "that substantially diminishes the ability of the defendant to

provide self-care within the environment of a correctional facility and from which he or she is

not expected to recover"); (2) the age of the defendant (defined as whether the defendant is at

least 65 years old, is experiencing a serious deterioration in physical or mental health because of

the aging process, and has served at least 10 years or 75 percent of his or her term of

imprisonment, whichever is less); (3) family circumstances (defined as the death or

incapacitation of the caregiver of the defendant's minor child or minor children or the

incapacitation of the defendant's spouse or registered partner when the defendant would be the

only available caregiver for the spouse or registered partner); and (4) any other extraordinary and

compelling reason determined by the Director of the BOP. USSG § 1B1.13 cmt. 1.

We are currently in a global health crisis caused by the 2019 novel Coronavirus

("COVID-19"), which already has taken the lives of more than 105,000 people just in the United

States during the past several months. When a defendant has a chronic medical condition that

may substantially elevate the defendant's risk of becoming seriously ill or dying from

COVID-19, that condition may satisfy the standard of extraordinary and compelling reasons. Under these circumstances, a chronic medical condition (*i.e.*, one from which a defendant is not expected to recover) reasonably may be found to be both serious and capable of substantially diminishing the ability of the defendant to provide self-care within the environment of a correctional facility, even if that condition would not have constituted an extraordinary and compelling reason absent the heightened risk of COVID-19. *See generally* USSG § 1B1.13 and cmt. 1(A)(ii)(I).

Alternatively, USSG § 1B1.13, as currently written, does not constrain the Court's ability to find extraordinary and compelling reasons here. Because the Sentencing Commission's policy statement was not amended after enactment of the First Step Act, "a growing number of district courts have concluded the Commission lacks an applicable policy statement regarding when a judge can grant compassionate release" . . . "because the Commission never harmonized its policy statement with the FSA." *United States v. Mondaca*, 2020 WL 1029024, at *3 (S.D. Cal. Mar. 3, 2020) (citing *Brown v. United States*, 411 F. Supp. 3d 447, 499 (canvassing district court decisions)) (quotation marked omitted); *see also United States v. Redd*, 2020 WL 1248493, at *6. (E.D. Va. Mar. 16, 2020) ("[T]here does not currently exist, for the purposes of satisfying the ["FSA's] 'consistency' requirement, an 'applicable policy statement.'"); *United States v. Barber*, 2020 WL 2404679, at *3 (D. Or. May 12, 2020) ("The Court is persuaded by the reasoning of numerous other district courts and holds that it is not constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction.") (citations and quotation marks omitted).

As explained by one court, "a majority of federal district courts have found that the most natural reading of the amended § 3582(c) and [28 U.S.C.] § 994(t) is that the district court

assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." *United States v. Perez*, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020). Indeed, the Government previously conceded this point in *United States v. Young*, agreeing that "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act." 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020). The court in *Young* followed many other district courts in recognizing that § 1B1.13's defined categories are not exclusive: "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." *Id*. The Court agrees with this alternative analysis as well.

**C.  Safety of Other Persons and the Community**

The policy statement further provides that, in addition to finding extraordinary and compelling reasons, a court also must find that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13(2). The factors to be considered in deciding whether a defendant is a danger to the safety of any other person or to the community are: (1) the nature and circumstances of the offense (including whether the offense is a crime of violence, a violation of 18 U.S.C. § 1591, a federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device); (2) the weight of the evidence; (3) the history and characteristics of the defendant (including, among other things, the defendant's character, physical and mental condition, and family ties and whether at the time of the offense or arrest the defendant was on probation, parole, or other release); and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

**D.  Sentencing Factors Under § 3553(a)**

Finally, as provided in both § 3582(c)(1)(A) and the policy statement, a court must consider the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable. These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed training, medical care, or other treatment in the most effective manner. 18 U.S.C. § 3553(a). The policy statement also recognizes that the sentencing court "is in a unique position to determine whether the circumstances warrant a reduction . . ., after considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy statement[.]" USSG § 1B1.13 cmt. 4.

## ANALYSIS

Ms. DeMille was a nurse practitioner licensed to prescribe controlled substances in the State of Texas and later in the State of Oregon. She had the authority to write prescriptions without the oversight or supervision of a physician. In 2014, Ms. DeMille moved to Oregon and worked fulltime at a publicly funded county health clinic near Portland. In addition, in January 2015, Ms. DeMille and a business partner opened Fusion Wellness Clinic ("FWC") in Portland, which operated only on Fridays and Saturdays. Originally, FWC operated out of a small office located across the street from the Multnomah County Parole and Probation Office.

Word quickly spread of the small, cash-only clinic where opioid prescriptions came easy. On Friday and Saturday mornings, customers spilled out into the parking area and waited in cars for their turn in the small office. In April 2015, Ms. DeMille and her business partner moved FWC to a larger location in Portland. Ms. DeMille also continued to work ten-hour days Monday through Thursday at her county health clinic position. In 2016, Ms. DeMille secured regular

Thursday leave from her public position by submitting a false Family Medical Leave claim. Ms. DeMille then expanded her FWC hours to include Thursdays. In a typical FWC day, Ms. DeMille could see up to 20 patients. The FWC charged each patient $200 cash per visit. In 2015, Ms. DeMille wrote at least 1,940 prescriptions for controlled substances. At $200 per visit/prescription, 1,940 prescriptions generated at least $388,000 in revenue for the FWC, which Ms. DeMille shared with her business partner.

According to the Government, Ms. DeMille performed only cursory examinations on new patents. Based on the cooperation of a confidential source ("CS") and the statements of many patients, follow-up visits did not include exams. For example, on March 10, 2016, the CS had a follow-up office visit with Ms. DeMille at the FWC. During this visit, the CS saw Ms. DeMille for approximately 45 seconds. She did not perform any exam. Ms. DeMille wrote the CS a prescription for 120 tablets of oxycodone 15mg. On April 14, 2016, the CS had another follow-up office visit with Ms. DeMille at the FWC. During this visit, the CS saw Ms. DeMille for approximately 80 seconds. She did not perform any exam. Ms. Demille wrote the CS a prescription for 120 tablets of oxycodone 15mg. ECF 85 at 4.

Ms. DeMille pleaded guilty to two counts of distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1), one count of filing a false tax return in violation of 18 U.S.C. § 7206(1), and one count of making a false statement to a federal law enforcement officer in violation of 18 U.S.C. § 1001. In her plea agreement, Ms. DeMille, admitted that she distributed controlled substances, that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose, and that she acted with the intent to distribute the drugs outside the usual course of professional practice. ECF 56 at 2-3.

On March 26, 2019, the Court sentenced Ms. DeMille to 48 months imprisonment, followed by three years of supervised release. She self-surrendered to the BOP on May 9, 2019. She is currently incarcerated at the Federal Correctional Institution ("FCI") at Dublin, California. Her scheduled release date is October 1, 2022. She has served about 30 percent of her scheduled sentence. Ms. DeMille has no record of infractions while in custody. She also has no criminal history before the current offenses of conviction.

Ms. DeMille will turn 62 years old later this month. She has atrial flutter, thyroiditis, gallbladder issues, a benign growth on a kidney requiring regular monitoring, and a history of cervical cancer that resulted in a hysterectomy approximately 20 years ago. She also "struggles with obesity."

The CDC states that "[p]eople 65 years and older" are "at high-risk for severe illness from COVID-19." *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (lasted visited June 4, 2020). In addition, the CDC explains all people of all ages with certain underlying medical conditions, particularly if not well controlled, are also at high-risk for severe illness from COVID-19. According to the CDC, these underlying medical conditions are:

- People with chronic lung disease or moderate to severe asthma

- People who have serious heart conditions

- People who are immunocompromised

        *    *    *

- People with severe obesity (body mass index [BMI] of 40 or higher)

- People with diabetes

- People with chronic kidney disease undergoing dialysis

- People with liver disease

*Id*. Ms. DeMille is not quite yet 62 years old. She also does not appear to fall clearly within any of the "high risk" conditions identified by the CDC.

The Government does not argue that the early release of Ms. DeMille would present any risk to the safety of any other person or to the community. The Court agrees and notes that Ms. DeMille no longer has the authority to write prescriptions.

Compassionate release is "rare" and "extraordinary" and courts routinely deny such claims. *United States v. Mangarella*, 2020 WL 1291835, at *2–3 (W.D.N.C. Mar. 16, 2020) ("[A] compassionate release . . . is an extraordinary and rare event.") (citation omitted). Further, a defendant bears the burden to show special circumstances meeting the high bar set by Congress and the Sentencing Commission for compassionate release. *See United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (holding that a defendant bears the burden of establishing entitlement to sentencing reduction and citing *United States v. Sprague*, 135 F.3d 1301, 1306-07 (9th Cir. 1998)). As other district courts have noted: "To be faithful to the statutory language requiring 'extraordinary and compelling reasons,' it is not enough that Defendant suffers from . . . chronic conditions that [he] is not expected to recover from. Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release." *United States v. Ayon-Nunez*, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) (rejecting a claim for compassionate release from a defendant suffering from severe back injuries and epilepsy) (brackets in original) (quoting *United States v. Weidenhamer*, 2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019)). The Court also must consider the sentencing factors under § 3553(a), to the extent they are applicable. *See* § 3582(c)(1)(A) and USSG § 1B1.13.

As previously noted, Ms. DeMille is currently incarcerated at FCI Dublin and has served only about 30 percent of her scheduled sentence. As of June 3, 2020, the BOP has reported that

only one staff person has tested positive for COVID-19 at that facility and that there are no

confirmed cases of COVID-19 among any inmates at FCI Dublin. *See*

https://www.bop.gov/coronavirus/ (last visited June 4, 2020).[2]

The Court has considered all the relevant factors for compassionate release. Based on

Ms. DeMille's medical condition, the current health situation at FCI Dublin, and the fact that

Ms. DeMille has served only about 30 percent of her sentence, the Court concludes that she has

not shown special circumstances meeting the high bar set by Congress and the Sentencing

Commission for compassionate release to be granted.

## CONCLUSION

The Court DENIES Defendant's Motion to Reconsider Emergency Motion for

Compassionate Release. (ECF 80 in Case No. 3:18-cr-149-SI; ECF 25 in Case No. 3:18-cr-594-

SI).

**IT IS SO ORDERED.**

DATED this 4th day of June, 2020.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

[2] The BOP's information, however, is of limited value. The BOP does not disclose whether or to what extent this facility is testing symptomatic or asymptomatic inmates, both or neither. In *United States v. Pabon*, 2020 WL 2112265, at *5 (E.D. Pa. May 4, 2020), the court cited Johns Hopkins Bloomberg School of Public Health Professor Leonard Rubenstein to explain the link between testing and limiting the spread of COVID-19: "Unless you do universal testing in all environments, the risk of spread is enormous. If you are waiting for symptoms to emerge before you do the testing, you are getting a false picture of what is going on . . . It's too late." *Id.* (citing Kevin Johnson, Mass Virus Testing in State Prisons Reveals Hidden Asymptomatic Infections; Feds Join Effort, USA TODAY (Apr. 25, 2020, updated Apr. 27, 2020), https://www.usatoday.com/story/news/politics/2020/04/25/coronavirus-testing-prisons-revealshidden-asymptomatic-infections/3003307001/) (last visited June 2, 2020); *see also Arias v. Decker*, 2020 WL 2306565, at *8 (S.D.N.Y. May 8, 2020) ("[W]hen it comes to vulnerable detainees . . ., monitoring them for signs of infection is too little, too late.").